IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EMILY E. GORR-BRASILE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 08-737 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

## **I. INTRODUCTION**

Plaintiff, Emily E. Gorr-Brasile, seeks judicial review of a decision of Defendant, Commissioner of Social Security ("the Commissioner"), denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth below, each party's motion for summary judgment will be granted in part and denied in

---

[1]The Social Security system provides two types of benefits based on an inability to engage in substantial gainful activity: the first type, SSI, provides benefits to disabled individuals who meet low-income requirements regardless of whether the individuals have ever worked or paid into the Social Security system, and the second type, DIB, provides benefits to disabled individuals who have paid into the Social Security system through past employment. Belcher v. Apfel, 56 F.Supp.2d 662 (S.D.W.V. 1999). Based on her earnings record, Plaintiff met the insured status requirements of the Social Security Act for purposes of DIB through September 30, 2003. (R. 115).

1

part.

## II. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on February 1,
2005, alleging disability since March 30, 2003 due to depression,
anxiety and recovering from drug addiction.[2]  (R. 80-82, 105, 223-
25).  Following the denial of Plaintiff's applications for DIB
and SSI, she requested a hearing before an Administrative Law
Judge ("ALJ").  (R. 63).  At the hearing, which was held on
August 28, 2007, Plaintiff, who was represented by counsel, and a
vocational expert ("VE") testified.  (R. 255-89).

On September 10, 2007, the ALJ issued a decision denying
Plaintiff's applications for DIB and SSI based on his conclusion
that Plaintiff retained the residual functional capacity ("RFC")
to perform work existing in significant numbers in the national
economy.[3]  (R. 16-29).  Plaintiff requested review of the ALJ's

---

[2]In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months.  42 U.S.C.
§ 423(d)(1).  A claimant is considered unable to engage in any
substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
42 U.S.C. § 423(d)(2)(A).

[3]RFC is the most a disability claimant can still do despite
his or her limitations.  Hartranft v. Apfel, 181 F.3d 358, 359 n.
1 (3d Cir.1999)(citing 20 C.F.R. § 404.1545(a)).

2

decision. (R. 12). However, the request was denied by the Appeals Council on May 8, 2008. (R. 5-7). This appeal followed.

## III. **FACTUAL BACKGROUND**

Plaintiff was born on June 23, 1982, and she is a high school graduate (June 2000). (R. 80, 102). In the past, Plaintiff has been employed as a busperson in a restaurant (October 1998 to January 2000), a cashier in a retail store (February 2002 to June 2002) and a dishwasher in a restaurant (October 2002 to March 2003). (R. 97).

In 1999, when she was 17 years old, Plaintiff underwent a Court-ordered mental health evaluation. She was diagnosed with depression, prescribed antidepressant medication and received counseling.[4] (R. 108). In 2002, at the age of 20, Plaintiff began to abuse drugs. Her "drug of choice" was cocaine, although she also used heroin. (R. 267-68).

On October 23, 2003, Plaintiff was seen by her primary care physician ("PCP") for complaints of mood swings.[5] The PCP

---

[4]There is no evidence in the record concerning the circumstances leading to Plaintiff's Court-ordered mental health evaluation.

[5]With regard to her mood swings, Plaintiff testified at the hearing before the ALJ as follows:

\*   \*   \*

Q. All right, tell me about the cycles. Pick whichever one you'd like, the low or the high first.

A. Well, my - like my highs, my manics, I get extremely - I

3

prescribed antidepressant medication for Plaintiff and referred her to outpatient mental health treatment. (R. 139). In late 1993, Plaintiff was seen by a mental health counselor at Latrobe Hospital a "few" times. (R. 99).

From July 2004 to December 2004, Plaintiff was incarcerated in the Westmoreland County Jail following a conviction related to stolen checks.[6] During this period of incarceration, Plaintiff was prescribed Trazadone and Mellaril.[7] Upon release from

---

can't think of the word - irritable. Anything will set me off, and I - that's whenever I go into my snapouts is when I'm usually - my snapouts are usually my manic periods, like my high periods. I get very verbally aggressive. I get mean. I say - you know, I say things intentionally to be mean.

\* \* \*

Q. Okay, what about the lows? Do you have lows?

A. I do. They're not as - I just tend to isolate myself and stay in my room. There's times where I can sleep for days if I'm not woken up. I tend mainly to sleep or like, you know, stay in a shell in my room by myself, isolate myself.

\* \* \*

(R. 265-67).

---

[6]Plaintiff testified at the hearing before the ALJ that this criminal offense resulted from her drug addiction. (R. 271).

[7]Trazadone is an antidepressant medication, and Mellaril is an antipsychotic medication used to treat schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). www.nlm.nih.gov/medlineplus/druginfo (last visited 3/9/2009).

4

imprisonment, Plaintiff was placed on probation until 2011. As a condition of probation, Plaintiff must attend Alcoholics Anonymous ("AA") meetings on a weekly basis. (R. 100-01, 110, 124-27, 271).

On January 21, 2005, Plaintiff was seen by her PCP for "medication questions." Plaintiff reported that she had just finished a drug rehabilitation program; that she had been "clean" for 6 months; and that she was having difficulty getting an appointment for mental health counseling at Latrobe Hospital. The PCP diagnosed Plaintiff with depression and anxiety. (R. 135). A week later, the PCP performed a disability examination of Plaintiff, noting that Plaintiff needed help getting disability benefits, and that Plaintiff was "unable to keep a job due to being a recovering addict." (R. 134). Shortly thereafter, Plaintiff filed her applications for DIB and SSI.

In a Disability Report completed on March 23, 2005, Plaintiff indicated that she could not work after March 30, 2003 because she "was constantly overwhelmed with working long periods of time and [she] constantly lost jobs due to [poor] attendance and tardiness." (R. 106). In a Daily Activities Questionnaire completed a week later, Plaintiff indicated that she could take care of her personal needs without assistance, clean the house

5

she shared with her father,[8] shop, prepare meals, drive a car and get along with family, friends and neighbors. However, she could not handle her own bills. As to activities, Plaintiff indicated that she attended holiday dinners with her family and weekly AA meetings where she had developed friendships. Plaintiff also indicated that she got along well with authority since she had stopped abusing drugs, and that she could tolerate criticism "to an extent". Plaintiff also indicated that she had difficulty going out in public because she was easily irritated by strangers; that she had been fired from jobs for poor attendance and tardiness; that she had difficulty completing projects or activities due to a short attention span; that changes made her nervous; that she could plan a short day but was overwhelmed by planning a long day; that she could make decisions, although it took her awhile; and that she was not on medication for her mental impairments at that time because she was pregnant. (R. 117-21).

On May 9, 2005, Peter Saxman, Ph.D. performed a consultative psychological examination of Plaintiff at the request of the Pennsylvania Bureau of Disability Determination. With regard to Plaintiff's mental status, Dr. Saxman noted that Plaintiff made "some eye contact"; she exhibited shifts in anxiety relating to

---

[8]Plaintiff was married in October 2005. At the time of the hearing before the ALJ, Plaintiff resided with her husband and her father. (R. 259-60).

6

her legal problems; she was cooperative and polite, although she did not appear well organized or goal directed; she exhibited some confusion and mild depression; her affective expression was restricted due to anxiety during the examination, but her emotional expression was appropriate; she was distractible; she exhibited no loose associations or thought disturbances, but her concentration was poor; she "seem[ed]" oriented to time, place and person; her memory was poor "for many things"; when tested for immediate retention and recall, she repeated six digits forward and five digits backwards; her social judgment and test judgment were poor; she had little insight; and her reliability was fair. Dr. Saxman listed Plaintiff's diagnoses as (1) Cocaine Abuse, in remission, (2) Obsessive-Compulsive Disorder, (3) Panic Disorder without Agoraphobia and (4) Major Depression, mild. With respect to Plaintiff's ability to engage in work-related mental activities, Dr. Saxman opined that Plaintiff had moderate limitations in her ability to understand, remember and carry out short, simple instructions, and that she had marked limitations with regard to using judgment, making decisions, responding to the public, supervisors and coworkers, dealing with work pressures, and adapting to changes in routine. (R. 166-70).

On June 15, 2005, Sharon Tarter, Ph.D., a non-examining State agency psychological consultant, completed a Psychiatric Review Technique Form in connection with Plaintiff's applications

for DIB and SSI. With regard to the functional limitations

resulting from Plaintiff's diagnosed mental impairments, Dr.

Tarter opined that Plaintiff was mildly restricted in activities

of daily living; that Plaintiff had moderate difficulties in

maintaining social functioning and in maintaining concentration,

persistence or pace; and that Plaintiff had never experienced an

episode of decompensation of extended duration.[9]  (R. 171-83).

Dr. Tarter also completed a Mental RFC Assessment for

Plaintiff on June 15, 2005. In summary, Dr. Tarter opined that

Plaintiff was not significantly limited with respect to

_____

[9]"Episodes of decompensation" are defined in the Social
Security Regulations as follows:

> \*   \*   \*
>
> *Episodes of decompensation* are exacerbations or
> temporary increases in symptoms or signs accompanied by a
> loss of adaptive functioning, as manifested by difficulties
> in performing activities of daily living, maintaining social
> relationships, or maintaining concentration, persistence, or
> pace. Episodes of decompensation may be demonstrated by an
> exacerbation in symptoms or signs that would ordinarily
> require increased treatment or a less stressful situation
> (or a combination of the two). Episodes of decompensation
> may be inferred from medical records showing significant
> alteration in medication; or documentation of the need for a
> more structured psychological support system (e.g.,
> hospitalizations, placement in a halfway house, or a highly
> structured and directing household); or other relevant
> information in the record about the existence, severity, and
> duration of the episode.
>   The term *repeated episodes of decompensation, each of*
> *extended duration* ... means three episodes within 1 year, or
> an average of once every 4 months, each lasting for at least
> 2 weeks....
>
> \*   \*   \*

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(4).

Understanding and Memory, and that she was either not significantly limited or only moderately limited in various abilities relating to Sustained Concentration and Persistence, Social Interaction and Adaptation. (R. 184-87).

On June 30, 2005, Plaintiff gave birth to a premature baby who only lived a few hours. Subsequently, Plaintiff's mental impairments worsened and she suffered a relapse with regard to drug abuse. (R. 263).

On August 1, 2005, Kimberly Landa, a mental health therapist with Tim Bridges, Ph.D. & Associates, Inc., performed an initial intake assessment of Plaintiff. Following the interview, Ms. Landa rated Plaintiff's score on the Global Assessment of Functioning ("GAF") Scale a 58 and her highest score during the past year a 63.[10] (R. 188-96). On August 17, 2005, Ms. Landa

_____

[10]GAF scores are used by clinicians to report an individual's overall level of psychological, social and occupational functioning. The highest possible score is 100, and the lowest is 1. GAF scores between 51 and 60 denote **"[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends or conflict with peers or co-workers). GAF scores between 61 and 70 denote **"[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships."** American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, at 32-34 (bold face in original). A GAF score is but one piece of evidence to be considered by an ALJ in assessing a claimant's RFC.

9

revised Plaintiff's diagnoses to include (1) Generalized Anxiety
Disorder, (2) Major Depressive Disorder, Single Episode,
Moderate, (3) Bipolar Disorder, NOS and (4) Panic Disorder
without Agoraphobia. (R. 197). Plaintiff continued to see Ms.
Landa for mental health treatment through December 2005. During
that period of time, she also was seen by Tim Bridges, Ph.D. on
two occasions.[11]  (R. 284).

Plaintiff was seen by Dr. Monsour, a psychiatrist, at Pine
Brook Psychological Services on one or two occasions in 2006.[12]
(R. 283). In August 2006, Plaintiff violated the conditions of
her probation by testing positive for cocaine. For three months
beginning in January 2007, Plaintiff was incarcerated for the
probation violation. From October 2006 until her incarceration
in January 2007, Plaintiff was treated by Dr. Jan, a
psychiatrist,[13] who prescribed Celexa and Risperdal for her.[14]  (R.

---

[11]Plaintiff's administrative file does not contain any
records concerning Plaintiff's treatment by Ms. Landa and Dr.
Bridges after her initial intake assessment.

[12]Plaintiff's administrative file does not contain any
records from Dr. Monsour.

[13]Plaintiff's administrative file does not contain any
records from Dr. Jan.

[14]Celexa is used to treat depression, and Risperdal is used
to treat, among other things, episodes of mania (frenzied,
abnormally excited or irritated mood) and mixed episodes of mania
and depression that happen together in individuals with bipolar
disorder (a disease that causes episodes of depression, episodes
of mania and other abnormal moods).  www.nlm.nih.gov/medlineplus/

10

281-82).

On June 19, 2007, Plaintiff began treatment with Dr. Herbert Chissell, a psychiatrist.[15] After three individual sessions, Dr. Chissell performed a psychological evaluation of Plaintiff on July 31, 2007. In an Employability Re-Assessment Form completed for the Pennsylvania Department of Public Welfare on that date, Dr. Chissell listed Plaintiff's diagnoses as Bipolar Disorder and Cocaine Dependence in partial remission, and he indicated that Plaintiff would be temporarily disabled from July 31, 2007 to July 31, 2008. (R. 207, 215-16).

On August 21, 2007, Plaintiff was seen by Dr. Chissell for a medication check. In his report of the visit, Dr. Chissell noted that Plaintiff reported mood swings since adolescence which became much worse after the loss of her baby in June 2005. With respect to progress, Dr. Chissell indicated that, with treatment, Plaintiff had maintained abstinence from cocaine, her mood had stabilized and was less labile, she was much less irritable and she was not depressed. Dr. Chissell described Plaintiff's prognosis as "good" if she adhered to treatment. Dr. Chissell indicated that Plaintiff would require future treatment for "at

druginfo (last visited 3/9/2009).

[15]At the hearing before the ALJ, Plaintiff attributed the delay between her release from incarceration in March or April 2007 and the commencement of her treatment with Dr. Chissell in June 2007 to her desire to find a new therapist, insurance issues and difficulty getting an appointment with Dr. Chissell. (R. 264).

11

least 1 year", and that Plaintiff could not engage in employment on a regular basis at that time because of her continued need for treatment to sustain recovery. (R. 206-08).

On August 21, 2007, Dr. Chissell also completed a Mental Impairment Questionnaire for Plaintiff. Dr. Chissell listed Plaintiff's diagnosis as Bipolar Disorder, indicating that Plaintiff suffered from the following symptoms: poor memory, sleep disturbance, mood disturbance, emotional lability, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation, decreased energy when depressed, manic syndrome, and hostility and irritability when manic. Dr. Chissell rated Plaintiff's GAF score at that time a 50,[16] and he noted that Plaintiff was not a malingerer. Dr. Chissell indicated that Plaintiff's mental impairment had lasted, or could be expected to last, at least 12 months, and he opined that Plaintiff would be absent from work about three times a month if untreated. As to functional limitations, Dr. Chissell opined that Plaintiff was mildly restricted in activities of daily living; that Plaintiff had moderate difficulties in maintaining

---

[16]GAF scores between 41 and 50 denote **"[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, at 32-34 (bold face in original).

12

social functioning and in maintaining concentration, persistence or pace; and that Plaintiff had experienced four or more episodes of decompensation each of extended duration. With regard to making occupational adjustments, Dr. Chissell opined that Plaintiff had no useful ability to relate to co-workers, interact with supervisors and deal with work stresses. As to making personal-social adjustments, Dr. Chissell opined that Plaintiff had no useful ability to demonstrate reliability. (R. 198-205).

At the time of the hearing before the ALJ on August 28, 2007, Plaintiff was attending AA meetings three to five times a week, and she had not used cocaine for seven months. Plaintiff continued to see a mental health therapist on a weekly basis and Dr. Chissell on a monthly basis for medication checks. Plaintiff testified that the treatment was helping her (i.e., her mood swings were not as frequent or severe), and her medications did not cause any side effects. (R. 263-65, 267-68, 270-71, 282).

## IV. ALJ'S DECISION

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process,[17] which was described by the United States Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\*　\*　\*

Pursuant to his statutory authority to implement the SSI

---

[17]See 20 C.F.R. § 404.1520(a)(4).

13

> Program, (footnote omitted) the Secretary has promulgated
> regulations creating a five-step test to determine whether
> an *adult* claimant is disabled.  See Bowen v. Yuckert, 482
> U.S. 137, 140-42 (1987).  (footnote omitted).  The first two
> steps involve threshold determinations that the claimant is
> not presently working and has an impairment which is of the
> required duration and which significantly limits his ability
> to work.  See 20 C.F.R. §§ 416.920(a) through (c)(1989).  In
> the third step, the medical evidence of the claimant's
> impairment is compared to a list of impairments presumed
> severe enough to preclude any gainful work.  See 20 C.F.R.
> pt. 404, subpt. P, App. 1 (pt. A)(1989).  If the claimant's
> impairment matches or is "equal" to one of the listed
> impairments, he qualifies for benefits without further
> inquiry.  § 416.920(d).  If the claimant cannot qualify
> under the listings, the analysis proceeds to the fourth and
> fifth steps.  At these steps, the inquiry is whether the
> claimant can do his own past work or any other work that
> exists in the national economy, in view of his age,
> education, and work experience.  If the claimant cannot do
> his past work or other work, he qualifies for benefits.
> §§ 416.920(e) and (f).

*     *     *

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one
through four of the sequential evaluation process.  At the fifth
step, the burden shifts to the Commissioner to consider
"vocational factors" (the claimant's age, education and past work
experience) and RFC to determine whether the claimant is capable
of performing other jobs existing in significant numbers in the
national economy despite his or her impairments.  See Ramirez v.
Barnhart, 372 F.3d 546, 550-51 (3d Cir.2004).

In the present case, steps one and two were resolved in
Plaintiff's favor.  Specifically, the ALJ found that Plaintiff
had not engaged in substantial gainful activity since her alleged

14

onset date of disability on March 30, 2003, and that Plaintiff suffered from the following severe impairments: a history of hepatitis C virus, major depressive disorder, bipolar disorder, panic disorder, generalized anxiety disorder, obsessive-compulsive disorder and a history of cocaine and heroin abuse. (R. 18). Turning to step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria of any listed impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 12.04 and Listing 12.06 relating to Affective Disorders and Anxiety-Related Disorders, respectively. (R. 19). Prior to proceeding to the fourth step, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform work at all exertional levels with the following limitations: (a) no job involving the handling, sale or preparation of food; (b) no job providing access to narcotic drugs; (c) no job in the medical field; (d) no job involving more than simple, routine, repetitive tasks; (e) no job involving a fast-paced production environment; (f) no job involving more than simple work-related decisions; (g) no job involving frequent work place changes; and (h) no job involving more than occasional interaction with supervisors, co-workers and the general public. (R. 19-26). As to step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work. (R. 26-27). Finally, at step five, based on the testimony

of the VE, the ALJ found that, considering Plaintiff's age,
education, work experience and RFC, jobs existed in significant
numbers in the national economy which Plaintiff could perform,
including the jobs of a marker, a maid/housekeeper and a
warehouse worker. (R. 27-28).

## V. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## VI. LEGAL ANALYSIS

### Disability Insurance Benefits

As noted in footnote 1 of this Memorandum Opinion, based on
her earnings record, Plaintiff's insured status for purposes of
eligibility for DIB expired on September 30, 2003. As a result,
it was incumbent upon Plaintiff to establish that she was

16

disabled as a result of her mental impairments on or before that date to be awarded DIB. The administrative record, however, is devoid of evidence relating to the 6-month period commencing March 30, 2003, when Plaintiff alleges she became unable to work, and September 30, 2003, when her insured status for purposes of DIB expired. Under the circumstances, Plaintiff has failed to meet her burden of establishing eligibility for DIB.

## **Supplemental Security Income**

i

Turning first to step three of the sequential evaluation process which requires an ALJ to determine whether a claimant's impairment meets or equals a listed impairment, and, therefore, is *per se* disabling, Plaintiff asserts that the ALJ erred by failing to find that her mental impairments met Listing 12.04 and/or Listing 12.06 relating to Affective Disorders and Anxiety-Related Disorders, respectively. After consideration, the Court concludes that the ALJ's step three determination was supported by substantial evidence.

In order to meet the required "B" criteria for either Listing 12.04 or Listing 12.06, the medical evidence must show that a claimant's mental impairment results in at least *two* of the following:

\* \* \*

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning;

17

or
    3.   Marked difficulties in maintaining concentration,
persistence, or pace; or
    4.   Repeated episodes of decompensation, each of extended
duration.

        \*    \*    \*

As noted by the ALJ, however, no treating, examining or reviewing
medical source has rendered an opinion that Plaintiff meets two
of the "B" criteria for Listing 12.04 and Listing 12.06. (R.
19).

     With respect to the examining medical source, on May 9,
2005, Dr. Saxman noted some marked difficulties in Plaintiff's
social functioning, *i.e.*, "[h]er interaction with persons in
authority, coworkers, peers, and the public is likely to be
poor." However, regarding Plaintiff's activities of daily living
and ability to concentrate, Dr. Saxman's report cannot be
interpreted as indicating marked restrictions or difficulties.
Moreover, Dr. Saxman does not mention any extended episodes of
decompensation in his report. Thus, Dr. Saxman's report did not
support a finding that Plaintiff met two of the "B" criteria
necessary to establish Listing 12.04 and Listing 12.06. (R. 169-
70).

     As to the reviewing medical source, Dr. Tarter specifically
addressed the "B" criteria for Listing 12.04 and Listing 12.06 in
the Psychiatric Review Technique Form completed on June 15, 2005,
and she rendered the opinion that Plaintiff was mildly restricted

18

in activities of daily living; that Plaintiff had moderate

difficulties in social functioning and concentration; and that

Plaintiff had never experienced an extended episode of

decompensation. (R. 181). Accordingly, the ALJ's adverse

determination at step three also is supported by Dr. Tarter's

assessment of the severity of the functional limitations caused

by Plaintiff's mental impairments.

Finally, regarding the treating medical source, on August

21, 2007, Dr. Chissell completed a Mental Impairment

Questionnaire in which he also specifically addressed the "B"

criteria of Listing 12.04 and Listing 12.06. In connection with

activities of daily living, Dr. Chissell opined that Plaintiff's

restrictions were mild, and, with respect to social functioning

and concentration, Dr. Chissell opined that Plaintiff's

difficulties were moderate. (R. 201). Under the circumstances,

the Mental Impairment Questionnaire completed by Dr. Chissell

also supports the ALJ's adverse determination at step three.[18]

---

[18]In the Mental Impairment Questionnaire, Dr. Chissell did
render the opinion that Plaintiff had experienced four or more
episodes of decompensation, each of extended duration, which
meets the fourth "B" criteria for Listing 12.04 and Listing
12.06. However, as noted by the ALJ in his decision, Dr.
Chissell did not provide the basis for this opinion and the
record lacks any evidence regarding psychiatric hospitalizations
or intense psychiatric treatment due to an extended episode of
decompensation by Plaintiff. (R. 23). In any event, to meet
either Listing 12.04 or Listing 12.06, a claimant must meet two
of the "B" criteria, and Dr. Chissell's opinion in the Mental
Impairment Questionnaire establishes only one. In this
connection, the Court also notes that in a Physician's Report
completed on the same day, Dr. Chissell was specifically asked to

19

In assessing Plaintiff's RFC prior to proceeding to step

four of the sequential evaluation process, the ALJ considered the

credibility of Plaintiff's statements concerning the intensity,

duration and limiting effects of the symptoms caused by her

mental impairments, concluding that the statements were not

"entirely credible". (R. 24). Plaintiff contends the ALJ's

evaluation of her credibility did not comport with the standard

to be applied in making credibility determinations, and,

therefore, the ALJ's credibility determination was flawed.

When evaluating a disability claimant's statements regarding

symptoms, the factors an ALJ should consider include the

following: (1) the claimant's daily activities; (2) the duration,

frequency and intensity of the claimant's symptoms; (3)

precipitating and aggravating factors; (4) the type, dosage,

effectiveness and side effects of any medication the claimant

takes to alleviate the symptoms; (5) treatment, other than

medication, the claimant receives or has received, for relief of

the symptoms; (6) any measures the claimant uses, or has used, to

relieve the symptoms; (7) the claimant's prior work record; and

identify the Social Security Listings of Impairments that
Plaintiff's mental impairments met. However, rather than
identify a listing in Section 12.00 of the Social Security
Listings of Impairments relating to Mental Disorders (which were
attached to the report he was asked to complete), Dr. Chissell
merely described Plaintiff's symptoms when she is depressed and
when she is manic. (R. 208).

(8) the claimant's demeanor during the hearing.  *See* 20 C.F.R.
§§ 404.1529(c)(3) and 416.929(c)(3).

A review of the ALJ's decision shows that he did, in fact,
consider the foregoing factors in evaluating Plaintiff's
credibility.  Specifically, the ALJ discussed Plaintiff's daily
activities; Plaintiff's statements regarding the duration and
severity of her symptoms; the effect of Plaintiff's abstinence
from cocaine on the severity of her symptoms; the effectiveness
of, and lack of side effects from, the antidepressant and
antipsychotic medication prescribed by Dr. Chissell; the
counseling that Plaintiff has received for her mental
impairments; the failure of Plaintiff to display any overt
symptoms of her mental impairments during the hearing); and the
negative inference arising from Plaintiff's sparse work history
(R. 24-25).  Thus, Plaintiff's claim that the ALJ's credibility
evaluation did not comport with the applicable standard lacks
merit.

Further, Plaintiff's chief complaint regarding the ALJ's
credibility determination concerns his failure to give what, in
essence, would be controlling weight to her reported symptoms
because of the consistency with which she reported the symptoms.[19]

---

[19]Plaintiff asserts: "Because she has consistently reported
all of her symptoms as evidenced in the administrative record,
full consideration of her statements concerning the severe nature
of her impairments are (sic) therefore required under SSR 96-7p."
(Document No. 10, p. 7).

21

However, the mere fact that a disability claimant consistently reports the severity of his or her symptoms does not require an ALJ to accept those reports. Rather, the severity of the reported symptoms also must be consistent with the other evidence in the claimant's administrative file. *See* Social Security Ruling 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").[20] In any event, a finding that a claimant's statements are not wholly credible is not in itself sufficient to establish that the claimant is not disabled. All of the evidence in the case file, including the claimant's statements, must be considered before a conclusion can be made about disability.

### iii

If a treating source's opinion on the nature and severity of a claimant's impairments is well-supported and not inconsistent with other substantial evidence in the administrative record, the ALJ must give controlling weight to the opinion, *i.e.*, it must be adopted. *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); Social Security Ruling 96-2p. Plaintiff asserts that the weight accorded the opinion of her treating psychiatrist was erroneous,

---

[20]Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).

22

and that if the ALJ had given proper weight to the opinion in assessing her RFC, a finding of disability would have been compelled. After consideration, the Court agrees.

Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, remember and carry out instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting. *See* Social Security Ruling 96-8p. In August 2007, after three individual sessions, a psychological evaluation and a medication check, Dr. Chissell, a psychiatrist, rendered the opinion that Plaintiff had no useful ability to relate to co-workers, interact with supervisors, deal with work stresses and demonstrate reliability, which precludes a finding that Plaintiff could engage in substantial gainful activity on a regular and continuing basis, *i.e.*, 8 hours a day, 5 days a week. This opinion was well-supported by the evidence in the administrative record, including Plaintiff's history of being fired by employers for excessive tardiness and absenteeism; her longstanding diagnoses of Major Depression and Bipolar Disorder; her history of counseling by various mental health providers; the need for antidepressant and antipsychotic medications to control her mental impairments; and the opinion of Dr. Saxman, the psychologist who conducted the consultative

examination of Plaintiff at the request of the Pennsylvania
Bureau of Disability Determination in May 2005 and concluded that
Plaintiff was markedly limited with regard to using judgment,
making decisions, responding to supervisors, co-workers and the
public, dealing with work pressures and adapting to changes in
routine.

The only medical opinion in the administrative file that is
contrary to Dr. Chissell's opinion regarding the severity of
Plaintiff's work-related limitations is set forth in the Mental
RFC Assessment completed by Dr. Tarter, the non-examining State
agency psychological consultant, in June 2005.  For the following
reasons, however, the Court concludes that Dr. Tarter's Mental
RFC Assessment is not supported by substantial evidence.  First,
in rendering the opinion that Plaintiff retained the mental RFC
to engage in substantial gainful activity, Dr. Tarter noted that
Plaintiff was not being prescribed any psychotropic medication in
June 2005.  (R. 186).  Dr. Tarter fails to acknowledge, however,
that Plaintiff was not taking any medication for her mental
impairments at that time because she was pregnant.[21]  Second, Dr.
Tarter found that Plaintiff could be expected to complete a
normal workday without exacerbation of her psychological
symptoms, sustain an ordinary routine and adapt to changes

_____

[21]This fact was noted in Dr. Saxman's report which was
considered by Dr. Tarter in completing Plaintiff's Mental RFC
Assessment.  (R. 166).

24

without supervision, and that Plaintiff had no restrictions with regard to understanding and memory. (R. 186). However, Dr. Tarter fails to cite the evidence on which she relies for these conclusions and the evidence in the record at that time does not support the conclusions, i.e., Plaintiff's Disability Report and Daily Activities Questionnaire and Dr. Saxman's report.[22] Third, Dr. Tarter states that full weight was not given to the opinion of Dr. Saxman concerning the extent of the limitations resulting from Plaintiff's mental impairments because the opinion was inconsistent "with the totality of the evidence in the file". (R. 186). Dr. Tarter fails, however, to identify the allegedly inconsistent evidence in Plaintiff's administrative file when she completed the Mental RFC Assessment.

In sum, the Court concludes that Dr. Tarter's Mental RFC Assessment does not constitute substantial, inconsistent evidence

_____

[22]Specifically, in the Disability Report completed on March 23, 2005, Plaintiff indicated that she "was constantly overwhelmed with working long periods of time" and "constantly lost jobs due to [poor] attendance and tardiness." (R. 106). In the Daily Activities Questionnaire completed on March 30, 2005, Plaintiff indicated that she had been fired in the past for poor attendance and tardiness; she did not have a long attention span; she gets nervous and tries to put off change as long as possible; she gets overwhelmed by long days; and she required help from co-workers to keep up with her work when she was employed. (R. 119-20). Finally, after performing a psychological examination of Plaintiff, Dr. Saxman reported that Plaintiff was easily distracted; her concentration was poor; her reliability was fair; she has a poor memory for many things; she is markedly impaired with respect to dealing with work pressures; and she is markedly impaired in adapting to changes in routine. (R. 168-70).

25

with respect to Dr. Chissell's opinion regarding the severity of the work-related limitations caused by Plaintiff's mental impairments. Therefore, the ALJ erred by failing to accord controlling weight to Dr. Chissell's opinion that Plaintiff could not engage in substantial gainful activity on a regular and continuing basis. As noted by the Court of Appeals for the Third Circuit in Morales v. Apfel, 225 F.3d 310, 319 (3d Cir.2000), "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability."

### iv

Finally, the Court agrees with Plaintiff that the VE's testimony in this case does not constitute substantial evidence supporting the ALJ's adverse decision because the hypothetical question posed to the VE did not include all of the work-related limitations resulting from Plaintiff's mental impairments which were supported by the opinions of the treating and examining medical sources. See Chrupcala v. Heckler, 829 F.2d 1269 (3d Cir.1987)("A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence.").

## VII. CONCLUSION

Based on the foregoing, the Commissioner's motion for

26

summary judgment will be granted with respect to Plaintiff's application for DIB; Plaintiff's motion for summary judgment will be granted with respect to her application for SSI; and the case will be remanded for an award of SSI and a determination of the date on which such award should commence.[23]

_William L. Standish_
William L. Standish
United States District Judge

Date: March 12, 2009

---

[23]Although Plaintiff alleged disability as of March 30, 2003, the medical evidence in the file supporting her claim of disabling mental impairments does not begin until October 23, 2003 when Plaintiff was seen by her PCP for complaints of mood swings.